USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 97-1557

 UNITED STATES,

 Appellee,

 v.

 OLADIPO SALIMONU,

 Defendant, Appellant.

 APPEAL FROM THE UNITED STATES DISTRICT COURT
 FOR THE DISTRICT OF MASSACHUSETTS
 [Hon. Mark L. Wolf, U.S. District Judge]

 Before

 Stahl, Circuit Judge,
 Magill,* Senior Circuit Judge,
 and Lipez, Circuit Judge.
 
 
 
 
 
 Kimberly Homan with whom Sheketoff & Homan and John L.
Roberts, by appointment of the Court, were on brief for appellant.
 Jennifer Zacks, Assistant United States Attorney, with whom
Donald K. Stern, United States Attorney, was on brief for appellee.
 

July 7, 1999

 
 
*Of the Eighth Circuit, sitting by designation. STAHL, Circuit Judge. After a 14-day trial, a jury found
defendant-appellant Oladipo Salimonu guilty on eight counts,
including, inter alia, conspiracy to import heroin. He appeals the
convictions on several grounds. After a careful review of the
record and Salimonu's arguments, we affirm.
 I.
 Background
 We sketch the facts in the light most favorable to the
verdict. See United States v. Cunan, 152 F.3d 29, 32 (1st Cir.
1998). Salimonu was involved in a conspiracy with Christopher
Perry, Ralph Petrosino, Kim McKinnon, and others to import heroin
from Thailand. Salimonu and Perry had known each other since about
1988. Beginning in 1990, Perry and Salimonu had several
conversations about smuggling drugs and recruiting couriers. Perry
recruited Petrosino and McKinnon to act as drug couriers, and
introduced Salimonu to them as "Laddie." In May 1992, Petrosino
traveled to Bangkok, Thailand, where "Laddie" called him several
times at his hotel. Petrosino was given a suitcase, which he
brought to McKinnon in Jakarta, Indonesia. "Laddie" called
McKinnon at her hotel every day she was in Jakarta. McKinnon
subsequently traveled to Boston with the suitcase, where customs
agents inspected it and found four kilograms of heroin. McKinnon
immediately agreed to cooperate with the customs agents, and that
night the agents recorded phone conversations between "Laddie" and
McKinnon. The agents then accompanied McKinnon to O'Hare Airport
in Chicago, where they arrested Perry, who also agreed to
cooperate. Agents arrested Petrosino a few days later, in Chicago. 
Thereafter, agents recorded a phone conversation between Petrosino
and "Laddie."
 On September 16, 1992, a grand jury returned an 
indictment against Salimonu for conspiracy to import heroin, in
violation of 21 U.S.C. 963, 952(a); importation of heroin, in
violation of 21 U.S.C. 952(a) and 18 U.S.C. 2; conspiracy to
possess with intent to distribute, and conspiracy to distribute
heroin, in violation of 21 U.S.C. 841, 846; possession of heroin
with intent to distribute, in violation of 21 U.S.C. 841(a)(1)
and 18 U.S.C. 2; and unlawful use of a communications facility
(the telephone) to facilitate the drug offenses, in violation of 21
U.S.C. 843(b).
 Salimonu was arrested on July 27, 1993. After the arrest
and while Salimonu was in custody, customs agents conducted a
warrantless search of his apartment, relying upon the consent of a
third party.
 On December 15, 1995, more than two years after his first
appearance in court, Salimonu moved for his indictment to be
dismissed with prejudice, alleging violations of both the Speedy
Trial Act ("STA") and his Sixth Amendment right to a speedy trial. 
The district court denied this motion, ruling that most of the time
that had elapsed was excludable from STA calculations. Trial began
on November 11, 1996.
 At trial, Petrosino, McKinnon, and Perry, all of whom had
entered plea agreements, identified Salimonu as "Laddie" and
testified against him. Their testimony was corroborated by, inter
alia, phone records discovered through a phone contract discovered
during the search of Salimonu's apartment, and by recordings of the
phone conversations between McKinnon and "Laddie" and between
Petrosino and "Laddie." Salimonu moved to suppress the phone
records and other documentary evidence seized in the search; the
district court denied the motion. Salimonu also attempted to
introduce expert testimony that the voice in the taped recordings
was not his, but the district court excluded the testimony.
 On December 6, 1996, a jury found Salimonu guilty on all
counts. He was sentenced to 264 months' imprisonment followed by
60 months' supervised release.
 On appeal, Salimonu challenges his conviction on five
grounds: (1) he was denied his rights under the STA; (2) he was
denied his Sixth Amendment right to a speedy trial; (3) evidence
used to convict him was illegally obtained in a warrantless search
of his apartment that violated the Fourth Amendment; (4) the
district court improperly excluded expert testimony from evidence;
and (5) the evidence was insufficient as a matter of law to
establish his guilt beyond a reasonable doubt.
 We discuss each issue in turn, setting forth additional
relevant facts as necessary.
 II.
 Speedy Trial Act
 Salimonu claims that the STA, 18 U.S.C. 3161-3174, was
violated by the delays in bringing his case to trial, and that the
district court should therefore have dismissed his indictment. 
This court reviews an STA determination "for clear error as to
factual findings and de novo as to legal rulings." United States
v. Santiago-Becerril, 130 F.3d 11, 15 (1st Cir. 1997) (citation
omitted). 
 Section 3161(c)(1) of the STA dictates that a defendant
be tried within seventy days of the indictment or the date of
defendant's first appearance, whichever comes later. See 18 U.S.C.
 3161(c)(1). Section 3161(h), however, mandates the exclusion of
certain periods of delay in calculating these seventy days,
including some delays resulting from pretrial motions. See 18
U.S.C. 3161(h).
 Here, the relevant dates and proceedings are generally
not in dispute. Salimonu made his initial appearance in the
district court on September 3, 1993. Salimonu moved for a bill of
particulars and for further discovery relating to cooperating
witnesses on October 4, 1993. On November 11, 1993, without a
hearing, the magistrate judge denied these motions. On December 9,
1993, Salimonu moved for reconsideration of the magistrate's
November 11 orders in the district court, and requested a hearing
on the motions. The district court took no actions on Salimonu's
motions for reconsideration and did not schedule a hearing for
either motion. Two years later, on December 15, 1995, Salimonu
moved to dismiss the indictment against him with prejudice,
asserting violations of the STA.
 The parties are not in dispute that, as of December 8,
1993, fewer than 70 non-excludable days had elapsed. Thus, the
merits of Salimonu's STA motion turn on whether the time period
beginning December 9, 1993, when Salimonu made two motions for
reconsideration, is excludable for STA purposes. On June 29, 1996,
more than six months after Salimonu had filed his motion to dismiss
the indictment, the district court ruled that the time between the
filing of Salimonu's motions for reconsideration on December 9,
1993 and the hearing on those motions, which it scheduled for
August 2, 1996, was excludable under section 3161(h)(1)(F). That
section excludes "delay resulting from any pretrial motion, from
the filing of the motion through the conclusion of the hearing on,
or other prompt disposition of, such motion." 18 U.S.C.
 3161(h)(1)(F). The court first determined that a hearing was
required for Salimonu's motions to reconsider, and then concluded
that the long delay in holding the hearing was therefore
irrelevant. See Henderson v. United States, 476 U.S. 321, 329-30
(1986) ("[W]hen a pretrial motion requires a
hearing . . . subsection (F) on its face excludes the entire period
between the filing of the motion and the conclusion of the
hearing . . . whether or not a delay in holding that hearing is
'reasonably necessary.'"); United States v. Staula, 80 F.3d 596,
601 (1st Cir. 1996) ("For motions that require a hearing, this
subsection excludes the time between the filing of the motion and
the hearing on that motion, even if the delay is overlong,
inexplicable, or unreasonable.") (citations omitted).
 Salimonu first contends that the court erred in
determining that a hearing was required for his motions for
reconsideration. Such an error would be significant, because in
contrast to the potentially unreasonable time that is excluded from
STA calculations when a hearing is required, only 30 days may be
excluded when a hearing is not required. See Henderson, 476 U.S.
at 329 (stating that when a hearing is not required, a motion must
be given a "prompt disposition" within no more than the 30 days
provided for matters held under advisement in section
3161(h)(1)(J)). While there is little authority on what
constitutes a required hearing, this court has implied that a
request for a hearing ends the inquiry: "[T]he appellant requested
a hearing on his motions, thus acknowledging that one was
appropriate. Consequently, we need not discuss the factors that
determine whether a given motion 'requires' a hearing." Staula, 80
F.3d at 601 n.2; accord United States v. Tannehill, 49 F.3d 1049,
1052 n.4 (5th Cir. 1995). Because Salimonu requested a hearing in
this case, we properly can assume that such a hearing was required
for section 3161(h)(1)(F) purposes. In any event, the district
court in this case specifically found that this was the type of
motion for which hearings are required: "[A] hearing on the motions
filed on December 9, 1993 is required for their proper disposition. 
Both motions raise serious issues, particularly the motion for
discovery from cooperating individuals. It is this court's regular
practice to provide hearings on such motions and the court intends
to do so here." This is a sufficient indication that a hearing was
required: the district court is in a better position to determine
the necessity of a hearing than we are, and although the delay was
significant, we are loath to question the court's judgment in this
area absent obvious subterfuge. 
 Alternatively, Salimonu suggests that even if a hearing
was required for his motions, the delay in his case was not "delay
resulting from any pretrial motion," 18 U.S.C. 3161(h)(1)(F)
(emphasis added), but rather was caused by administrative
oversight. Some circuits have held that when there is no causal
link between the pretrial motion and the delay, the delay is not
excludable, see United States v. Gambino, 59 F.3d 353, 359 (2d Cir.
1995) (delay not excludable when hearing on motion was continued
until after trial); United States v. Clymer, 25 F.3d 824, 830-31
(9th Cir. 1994) (same), though not all the circuits have followed
this approach, see United States v. Riley, 991 F.2d 120, 123 (4th
Cir. 1993) (holding that when a hearing on a pretrial motion is
deferred until after trial, all of the time from the filing of the
motion until its disposition is nonetheless excludable); United
States v. Wilson, 835 F.2d 1440, 1443 (D.C. Cir. 1987) (holding
that "the exclusion of the time between the filing and disposition
of pretrial motions under 3161(h)(1)(F) is automatic and need not
cause actual delay of the trial"). Even if we were to adopt the
rule in Gambino and Clymer, however, the rule would not apply in
this particular factual situation.
 In both Gambino and Clymer, the district courts
explicitly continued the motions at issue until the end of the
trials. In effect, these continuances amounted to denying the
motions without prejudice to the filing of renewed submissions
after trial. See Gambino, 59 F.3d at 359; Clymer, 25 F.3d at 830. 
The Clymer court stated that this was the exceptional situation in
which "the pendency of the motion did not delay the start of the
trial; rather the delay in the commencement of the trial caused the
delay in hearing the motion." Clymer, 25 F.3d at 831. In
contrast, "in the ordinary case all pretrial delay that coincides
with the pendency of a motion will occur as a result of that motion
(because the district court will ordinarily hold off the trial date
until it decides the motion) . . . ." Id. at 830. Moreover, the
Supreme Court's determination in Henderson that even unreasonable
delays are "automatically" excluded lends support to the idea that
we should not examine whether the pending motion "caused" the delay
in a narrow sense. See Henderson, 476 U.S. at 327. Rather, as
long as a hearing on the motion is to be conducted before trial,
the delay until the hearing automatically should be considered
delay "resulting from" a pretrial motion.
 The delay in bringing Salimonu to trial was indeed
overlong, and the district court should have acted with much more
expedition. Nonetheless, because a hearing was required on his
motions for reconsideration, the delay "resulting from" these
motions was properly excluded from STA calculations. Thus, the
district court did not err in denying Salimonu's motion to dismiss
for violation of the STA.
 III.
 Sixth Amendment Claim
 The fact that the STA was not violated does not
automatically preclude us from finding a violation of Salimonu's
Sixth Amendment right to a speedy trial, although it would be
unusual to have a case where the STA is satisfied but the Sixth
Amendment guarantee is violated. See Santiago-Becerril, 130 F.3d
at 21. This circuit reviews a district court's ruling on a Sixth
Amendment speedy trial claim for abuse of discretion. See id.
 The district court correctly analyzed Salimonu's Sixth
Amendment claim in light of four factors: (1) length of delay; (2)
reason for the delay; (3) defendant's assertion of his right; and
(4) the prejudice to defendant. See Barker v. Wingo, 407 U.S. 514,
530 (1972). The court determined that the reasons for the delay
were, at least in part, attributable to Salimonu, and that Salimonu
failed promptly to assert his right. The court therefore concluded
that the length of the delay and the prejudice to Salimonu were
outweighed by his own responsibility for the delay.
 Salimonu has failed to meet his burden in showing that
this determination was an abuse of discretion. While the two-year
delay in proceeding with Salimonu's trial was inordinately lengthy,
Salimonu never made an attempt promptly to assert his speedy trial
right or to expedite his trial. See Barker, 407 U.S. at 532
(finding that failure to assert his right "will make it difficult
for a defendant to prove that he was denied a speedy trial");
Santiago-Becerril, 130 F.3d at 22 ("A defendant should give some
indication, prior to his assertion of a speedy trial violation,
that he wishes to proceed to trial.") (citations omitted). 
Salimonu never brought the pending motions to the court's attention
and waited two years before bringing his STA claim. Therefore, we
cannot say that the district court abused its discretion in
determining that Salimonu's own responsibility for the delay
outweighed the prejudice to him.
 IV.
 Search
 Salimonu claims that the warrantless search of his
apartment violated the Fourth Amendment because Tonya Picou, a
third party, did not have authority to consent to the search and
because her consent was involuntary. We review the legal
determination of whether a third party had authority to consent to
a search de novo. Cf. United States v. Schaefer, 87 F.3d 562, 565
(1st Cir. 1996). Voluntariness of a consent to search is a
question of fact, which we review for clear error. See United
States v. Kimball, 741 F.2d 471, 473 (1st Cir. 1984). 
 A. Background
 The evidence, as found by the district court, establishes
the following. On September 3, 1993, while Salimonu was in
custody, the management of Salimonu's apartment building informed
customs agents that a woman had been granted access to Salimonu's
apartment. The agents proceeded to the apartment, knocked on the
door, and Picou answered. The agents testified that Picou agreed
to a search of the apartment. She also told the agents that she
had received a letter giving her authority to move Salimonu's
property from the apartment, presenting to them the following
handwritten note, signed by Salimonu, using one of his aliases:
 To Whom It May Concern
 c/o Columbus Plaza

 This is to authorize the bearer of this
 letter, Ms. Tonya Picou to pick up all the
 contents of 233 E. Wacker, Apt. 3402 and to
 move them out and retain possession of the
 said contents as I am presently encountering
 some legal problems.

 So I Maxwell Ola-Cole (ssn XXX-XX-XXXX) hereby
 give Tonya Picou permission to remove all the
 furnishings and personal effects in their
 entirety.

 /s/ Maxwell Ola-Cole
 Apt. 3402

 After first performing a security sweep and then reading
the letter, the agents searched Salimonu's apartment. Picou was
present during the entire search, which lasted about an hour.
 During the search, the agents found and seized a number
of documents from the kitchen counters and drawers. These included
a cellular phone contract in the name of Angela Nash.
 On August 22, 1996, Salimonu moved to suppress the
evidence from the search, arguing both that Picou lacked authority
to consent to the search and that her consent was not voluntary. 
After holding an evidentiary hearing, the district court determined
that the letter gave Picou actual authority to permit the agents to
search Salimonu's apartment. The court also decided that Picou's
consent was voluntary.
 B. Analysis
 There is some question whether Salimonu's letter gave
Picou authority to consent to the search. See United States v.
Matlock, 415 U.S. 164, 171 n.7 (1974) ("common authority" over
property such that parties may consent to a search rests on "mutual
use of the property by persons generally having joint access or
control for most purposes") (emphasis added). But we need not
reach that more difficult issue because any error that the district
court may have committed is harmless; it is "'beyond a reasonable
doubt that the error complained of did not contribute to the
verdict obtained.'" United States v. Wihbey, 75 F.3d 761, 769
(1st Cir. 1996) (quoting Chapman v. California, 386 U.S. 18, 24
(1967)).
 As noted, the evidence that emerged as a result of the
search included a cellular telephone contract in the name of Angela
Nash. This contract did lead to the discovery of telephone
records which established that from December 31, 1991 through
February 6, 1992 -- almost four months before the drug couriers
left the country -- Salimonu made 40 calls to Perry's house, 17
calls to Perry's beeper, and 14 calls to the hotels where Perry and
McKinnon (who were romantically involved) were temporarily living. 
The content of these phone calls is unknown.
 Of course, these phone records tended to reinforce a
point already well-established by evidence obtained independently
of the search: that Salimonu and Perry were in regular contact with
one another. But the fact that Salimonu had an ongoing
relationship with Perry was all but conceded at trial. Moreover,
the mere fact that Salimonu called Perry regularly did little to
help prove the central point: that Salimonu was involved in an
illicit conspiracy, as was charged. 
 In contrast, there was overwhelming evidence indicating
that Salimonu was involved in the specific drug conspiracy in
question. See United States v. Innamorati, 996 F.2d 456, 476 (1st
Cir. 1993) (stating that "wrongfully admitted evidence must be
'quantitatively assessed in the context of other evidence
presented'") (citations omitted). The three co-conspirators
testified in detail as to Salimonu's leadership role in the
conspiracy, avowing that Salimonu planned the drug trips, paid the
co-conspirators' expenses, gave instructions as to where the
couriers should stay and what they should do, and contacted the co-
conspirators frequently. The fact that the three co-conspirators'
testimony was detailed and basically consistent, despite the fact
that all three were apprehended at different times and apparently
had no opportunity to contact one another after their arrests, was
substantial evidence of guilt. Compare Coppola v. Powell, 878
F.2d 1562, 1571 (1st Cir. 1989) (no harmless error where untainted
conflicting testimony of three jail inmates "raise[d] serious
questions of credibility" and there were "gaps in the
identification evidence") with Clark v. Moran, 942 F.2d 24, 32 (1st
Cir. 1991) (distinguishing Coppola, because even though untainted
inmate testimony "may have been inherently suspect because of the
inmates' personal motives for testifying," there was "no
conflicting testimony that needed to be reconciled" and there was
other corroboration). This testimony was further supported by
tapes of incriminating conversations between McKinnon and "Laddie"
and between Petrosino and "Laddie." The travel agent from whom
Petrosino bought his plane ticket to Bangkok identified Salimonu as
"Laddie," a regular customer at the travel agency, and testified
that Petrosino told him that he was recommended by "Laddie." 
Finally, an invoice seized from Perry's possessions included
handwritten notes of the names of hotels in Bangkok, along with a
notation that stated: "Portable wait for call from Laddie Monday or
Tuesday, 12 hours difference." Given all this evidence and given
the insignificance of the phone records in the totality of the
government's case, we are convinced that the records did not
contribute to the jury's verdict.
 In response to the government's suggestion that any error
was harmless, Salimonu argues that the phone records were not only
circumstantial evidence of the conspiracy, but were also essential
corroboration of the co-conspirators' testimony. According to
Salimonu, the records of the 14 calls to the hotels helped bolster
McKinnon's credibility by corroborating her testimony that Salimonu
called her. But the phone records only indicated that McKinnon was
being truthful as to that one narrow and unimportant point in her
testimony. Moreover, there was ample corroboration of McKinnon's
central testimony as to Salimonu's involvement in the drug
conspiracy. See supra. 
 We therefore find that any error in the admission of the
evidence derived from the search was harmless beyond a reasonable
doubt.
 V.
 Exclusion of Evidence
 Salimonu next claims that the district court erred in
excluding expert testimony regarding the taped phone conversations. 
We review the district court's decision to exclude expert testimony
for abuse of discretion. See General Elec. Co. v. Joiner, 522 U.S.
136, 138-39 (1997). The district court's decision to exclude
evidence pursuant to Fed. R. Evid. 403 is also reviewed for abuse
of discretion, with "great deference to the district court's
judgment." United States v. Currier, 836 F.2d 11, 18 (1st Cir.
1987).
 A. Background
 Evidence presented against Salimonu included taped
recordings of incriminating conversations between "Laddie" and
McKinnon and between "Laddie" and Petrosino. Also presented to the
jury, for purposes of comparison, was a voice exemplar that
contained a recording of Salimonu's voice. 
 Salimonu sought to introduce the testimony of two expert
witnesses to establish that the voice in the taped phone
conversations and Salimonu's voice on the exemplar were different. 
The court permitted Robert Berkovitz, the developer of a spectogram
computer program which plots the frequency and magnitude of speech
signals, to testify that substantial differences between the
spectograms of the two voices indicated that the tapes were of two
different people. But the court would not allow Dr. Stephen
Cushing, a linguist, to testify based on his listening to the tapes
that the two voices were different.
 The district court conducted a voir dire, during which
Cushing stated that he had listened to the tapes several times and
distinguished 14 differences between the two voices. Cushing
admitted that he had no training or special certification in voice
identification or comparison, and that he had only engaged in voice
recognition procedures two or three times before. He had never
before testified in court regarding voice identification. He
conceded that a person may be able to disguise his voice, and
stated that he did not know whether the voice in this exemplar was
disguised. Cushing knew of no studies to determine the rate of
error for this kind of identification. Finally, he stated that a
lay person without linguistics training would be able to discern
the same differences that he had by listening to the tapes.
 Based on the voir dire, the district court excluded
Cushing's testimony, relying upon several alternative theories. 
First, pointing to the lack of an error rate or other indicia of
reliability, the court concluded that voice comparison was not
scientific knowledge as defined in Daubert v. Merrell Dow Pharms.,
Inc. See 509 U.S. 579, 592-94 (1993) (relevant factors include
whether the technique has been tested, whether it is subject to
peer review, whether there is a high "known or potential rate of
error," and whether the technique enjoys general acceptance within
the scientific community). Given that the jurors could listen to
the tapes and discern differences in the voices themselves, the
court also determined that this would not be an area in which
expert testimony would be helpful to the jury. See id. at 591
(asserting that expert testimony must assist the jury in resolving
a relevant factual dispute); Fed. R. Evid. 702. Next, the court
concluded that Cushing was not a qualified expert in the field even
if this was a proper area for expert testimony, and his testimony
should therefore be excluded under Rule 702. See Fed. R. Evid. 702
(stating that a witness "qualified as an expert by knowledge,
skill, experience, training, or education" may give expert
testimony). Finally, the court stated that even if the testimony
were admissible under Rule 702, it should be excluded under Rule
403, because the unfair prejudice of the testimony would
substantially outweigh its probative value. See Fed. R. Evid. 403.
 B. Analysis
 Salimonu contends that the court erred in subjecting
voice comparison -- which he argues is specialized knowledge, not
scientific knowledge -- to the Daubert analysis for determining
whether expert testimony rests upon sound scientific methodology. 
According to Salimonu, the Daubert analysis only applies to
testimony based upon scientific knowledge. A recent Supreme Court
case contradicts this assertion and affirms that a district court
has discretion to determine the reliability of any specialized
knowledge asserted by an expert witness. See Kumho Tire Co., LTD.
v. Carmichael, 119 S. Ct. 1167, 1171, 1176 (1999). It would seem,
then, that the court's assessment that Cushing's analysis was not
reliable, based upon the lack of an error rate, the testimony that
a voice could be disguised, and the lack of other indicia of
reliability, was soundly within the court's discretion. See id. at
1179 (holding that the district court's decision that expert
testimony failed to satisfy Daubert's factors "or any other set of
reasonable reliability criteria" was not abuse of discretion). 
 At any rate, Cushing admitted that a layperson could
distinguish the differences that he found by listening carefully to
the two tapes. Thus, it was within the court's discretion to
determine that Cushing's testimony would not "assist the trier of
fact to understand the evidence or to determine a fact in issue." 
Fed. R. Evid. 702. Salimonu argues that the testimony would assist
the jury, because the jury could not, without expert assistance,
understand the reasons for the differences in the tapes or
determine whether the differences indicated that the two speakers
were different. Cf. United States v. Shay, 57 F.3d 126, 132 (1st
Cir. 1995) (questioning "'[w]hether the untrained layman would be
qualified to determine intelligently and to the best degree, the
particular issue without enlightenment from those having a
specialized understanding of the subject matter involved'")
(citations omitted). We are unconvinced. Cushing stated that an
ordinary lay person without training in linguistics would be able
to discern that the two voices were different without knowing why. 
It was not important, however, that the jurors be able to identify
exactly which vowel sounds or intonations were different in the two
tapes: their job was simply to determine whether the two voices
were different. By Cushing's own admission, the jurors were
perfectly well-equipped to do that. The court did not, therefore,
abuse its discretion in excluding Cushing's testimony. 
 VI.
 Sufficiency of the Evidence
 Finally, Salimonu contends that the government did not
establish that he was guilty of all elements of the crimes beyond
a reasonable doubt. We review the guilty verdict to determine
"whether, after viewing the evidence in the light most favorable to
the prosecution, any rational trier of fact could have found the
essential elements of the crime[s] beyond a reasonable doubt." 
Jackson v. Virginia, 443 U.S. 307, 319 (1979) (citation omitted).
 Salimonu argues that there was insufficient evidence to
support his convictions for conspiracy and for aiding and abetting
on Counts 1, 2, 3, and 4, because there was no evidence that the
co-conspirators had the requisite knowledge that they were agreeing
to import a controlled substance. This argument is patently
incorrect. Perry testified that he had many conversations with
Salimonu about smuggling drugs. This in itself is sufficient
evidence that Perry had the requisite knowledge. The testimony of
McKinnon and Petrosino about the large sums of money they were to
receive in exchange for transporting a suitcase into the country
would enable a reasonable jury to infer that they knew they were
importing a controlled substance into the country. Finally, the
court instructed the jury that it could find Salimonu guilty of
importing heroin even if McKinnon did not know she was bringing a
controlled substance into the country "if the defendant willfully
caused her to bring a controlled substance into the country." 
There was sufficient evidence for the jury to reach this
conclusion.
 Finally, Salimonu also argues that the voice
identification testimony by McKinnon was insufficient to support a
conviction on the counts involving use of a telephone. Between
McKinnon's testimony and the tapes of the conversations provided,
there was plenty of evidence to support the jury's verdict in this
regard.
 VII.
 Conclusion
 For the foregoing reasons, we affirm Salimonu's
convictions in all respects. 
 Affirmed. 

 

 Dissent follows. LIPEZ, Circuit Judge, dissenting. The majority concludes
that "any error the district court may have committed [in admitting
evidence from the search] is harmless" because it is "beyond a
reasonable doubt that the error complained of did not contribute to
the verdict obtained." I respectfully disagree with that
conclusion. I must therefore analyze the legality of the search
and the issue of harmless error.
 The Search
 I do not question the district court's factual findings,
e.g., I accept that Picou voluntarily consented to the search. I
do, however, disagree with the district court's legal determination
that Picou had actual legal authority or, in the alternative, that
she had apparent authority to consent to the search of Salimonu's
apartment.
 It is basic that "any intrusion upon a constitutionally-
protected privacy interest without a proper warrant is per se
unreasonable under the Fourth Amendment subject only to a few
specifically established exceptions." United States v. Donlin, 982
F.2d 31, 33 (1st Cir. 1992) (internal quotation marks omitted). 
Consent is one such exception to the warrant requirement. Id.; see
also Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). In order
for the consent to a warrantless search to be valid, however, the
consent must come either from the defendant or "from a third party
who possessed common authority over or other sufficient
relationship to the premises or effects sought to be inspected." 
United States v. Matlock, 415 U.S. 164, 171 (1974). The Court
explained in Matlock that common authority requires
 mutual use of the property by persons
 generally having joint access or control for
 most purposes, so that it is reasonable to
 recognize that any of the co-inhabitants has
 the right to permit the inspection in his own
 right and that the others have assumed the
 risk that one of their member might permit the
 common area to be searched.

Id. at n.7. It is common authority which gives the consenting
party the ability to allow the government to conduct a search "even
when the defendant specifically objects to it." Donlin, 982 F.2d
at 33. This common authority requirement reflects an important
principle: the consenting party does not waive the defendant's
Fourth Amendment rights. Instead, the consenting party voluntarily
consents to waive his or her own privacy interest in the property
to be searched, thereby validating the government's otherwise-
proscribed warrantless search. "The burden of establishing that
common authority rests upon [the government]." Illinois v.
Rodriguez, 497 U.S. 177, 181 (1990).
 The district court erred in concluding that Picou had the
requisite authority to consent to the search of Salimonu's
apartment. At the suppression hearing, it was established that
Picou did not live there; none of her possessions was in the
apartment; indeed, she had never been in the apartment before the
day it was searched. Far from having "joint access or control for
most purposes," Picou's authority was highly circumscribed, as was
evident from the letter and the circumstances surrounding her
presence (e.g., that she needed the building management to provide
her with a key). She had permission to enter the apartment solely
for the purpose of facilitating the move of Salimonu's possessions
into storage. Access to the apartment for that limited purpose
cannot be reconciled with the joint access or control for most
purposes which is required for valid consent. See United States v.
Hyson, 721 F.2d 856, 859 (1st Cir. 1983) (citing Matlock, 415 U.S.
at 171). 
 The district court did not distinguish between joint
access or control over (and thus authority to consent to a search
of) the apartment and joint access or control over the possessions
inside the apartment when it emphasized in its decision Picou's
authority to "take and retain possession of the property in the
defendant's apartment." See United States v. Warner, 843 F.2d 401,
403 (9th Cir. 1988) (permission for landlord to enter apartment for
particular purpose did not give landlord authority to consent to
search of apartment); see also United States v. Fultz, 146 F.3d
1102 (9th Cir. 1998) (distinguishing joint access to a garage from
joint access and control over the personal property in the garage). 
Whether the situation would be materially different if the
government had attempted to secure consent to search possessions
that had already been removed from the apartment is a question we
do not have to address. The fact is that the government decided to
execute a warrantless search of Salimonu's apartment and must
justify this search. Lacking joint access or control over the
apartment for most purposes, Picou lacked authority to consent to
its search.
 The government's alternative apparent authority theory
for justifying the search also misses the mark. Even if Picou
lacked actual authority to consent to the search of Salimonu's
apartment, the government argues, the search was valid because
Picou had apparent authority to consent. Relying on Illinois v.
Rodriguez, 497 U.S. 177 (1990), the government contends that the
Fourth Amendment is not violated by a consensual warrantless search
if the police mistakenly, but reasonably, believed that the
consenting party had actual legal authority to consent to the
search. See id. at 188-89. In Rodriguez, however, the police
officers were literally tricked into reasonably believing that the
consenting party had actual authority. See id. at 179. The police
in Rodriguez responded to a call and were met by Fischer, who
showed signs of a severe beating. She told the officers where they
could locate her assailant and agreed to take them to the apartment
and to unlock the door with her key so that the officers could
arrest him. Fischer repeatedly referred to the apartment as "our"
apartment, and told the officers that she had clothes and furniture
there. Id. Some of these representations turned out to be false,
and the Supreme Court concluded that the lower court's
"determination of no common authority over the apartment was
obviously correct." Id. at 182. Nonetheless, the Court held that
"what is generally demanded of the many factual determinations that
must regularly be made by [government] agents . . . is not that
they always be correct, but that they always be reasonable," id.
at 185-86 (italics added), and upheld the search because of
Fischer's apparent authority to consent to the search.
 In this case, there are no mistaken factual
determinations by the officers and the apparent authority doctrine
is thus inapplicable. See United States v. Whitfield, 939 F.2d
1071, 1074 (D.C. Cir. 1991) (holding that Rodriguez "held only that
the Fourth Amendment does not invalidate warrantless searches based
on a reasonable mistake of fact, as distinguished from a reasonable
mistake of law" and concluding that "Rodriguez thus applies to
situations in which an officer would have had valid consent to
search if the facts were as he reasonably believed them to be.");
United States v. Welch, 4 F.3d 761, 764 (9th Cir. 1993) ("[T]he
doctrine is applicable only if the facts believed by the officers
to be true would justify the search as a matter of law."). Neither
the Supreme Court nor any court of appeals that has applied
Rodriguez's apparent authority doctrine has extended it to validate
a warrantless search by officers who have made a reasonable error
of law. See United States v. Salinas-Cano, 959 F.2d 861, 866 (10th
Cir. 1992) ("[The police officer's mistake] was a mistake of law
rather then a mistake of fact, and Rodriguez therefore does not
resolve the issue.") (internal citation omitted). 
 Rodriguez does not purport to alter the legal standard
for determining authority to consent to a search. Instead, it
instructs that courts are to apply the correct legal standard not
only to the facts as they actually existed but to the facts as a
reasonable police officer would have believed them to be. In this
case, unlike in Rodriguez, there were no factual misunderstandings
about Picou's relationship with the apartment, and therefore the
apparent authority doctrine is inapplicable. The officers only
knew that someone who had come to the building with a letter from
Salimonu authorizing her access to the apartment had also been
given a key to the apartment by the building manager. On the basis
of this information alone, government agents went to the apartment
and asked Picou to consent to the search. It is irrelevant whether
they read the letter from Salimonu before or after securing Picou's
consent because, as discussed above, the letter as a matter of law
would not "warrant a man of reasonable caution in the belief,"
Rodriguez, 497 U.S. at 188, that Picou had "joint access or
control [over the apartment] for most purposes," Matlock, 415 U.S.
at 171, n.7. Under such circumstances, the warrantless entry was
unlawful. See Rodriguez, 497 U.S. at 188-89.
 Harmless Error Beyond a Reasonable Doubt
 Having determined that the warrantless search violated
Salimonu's Fourth Amendment right against unreasonable searches, I
must inquire whether the government can carry its burden "to prove
beyond a reasonable doubt that the error complained of did not
contribute to the verdict obtained." Chapman v. California, 386
U.S. 18, 24 (1967). The government's theory at trial was that
Salimonu organized and led a conspiracy involving Christopher
Perry, Kim McKinnon, and Ralph Petrosino, among others. The case
against Salimonu came from the testimony of Perry and McKinnon, who
had been caught with evidence incriminating them in a drug
importation scheme, and from Petrosino, who admitted his
involvement in the conspiracy. Each of them had plea bargained in
exchange for testimony implicating Salimonu. Other than the
testimony of the three co-conspirators, the government's remaining
evidence consisted largely of (1) tape-recorded telephone
conversations between Salimonu and McKinnon and Salimonu and
Petrosino; and (2) the evidence seized during the warrantless
search of Salimonu's apartment.
 The defense's theory was that Salimonu had been mis-
identified -- that Perry, McKinnon, and Petrosino had falsely
implicated him to protect themselves. One of the government's lead
agents testified that a woman who had been recruited to join but
did not in fact participate in the conspiracy identified another
man (also Nigerian) as "Laddie" and as the head of the conspiracy. 
There was evidence that for some time during the fourteen months
between the end of the conspiracy and Salimonu's eventual arrest
the government considered that man, Olayinka Apanpa, to be the
"Laddie" they were looking for, and three searches (each of them
pursuant to a search warrant) were executed on Apanpa's properties.
 I now turn to a more detailed discussion of the
government's evidence.
 1. The Consistency of the Co-conspirator's Testimony
 The majority notes the consistency of the testimony of
the co-conspirators and states that "[t]he three co-conspirators
testified in detail as to Salimonu's leadership role in the
conspiracy, declaring that Salimonu planned the drug trips, paid
the co-conspirators' expenses, [and] gave instructions as to where
the couriers should stay and what they should do." In fact,
however, McKinnon's and Petrosino's testimony was derived largely
from what Perry told them. McKinnon and Petrosino had limited
personal contact with Salimonu; their involvement in the conspiracy
was for the most part at the direction of Perry as well as other,
unindicted co-conspirators who did not testify. They were
recruited by Perry and both had personal relationships with Perry
which pre-dated and were independent of the alleged conspiracy. 
Perry's motivation to plea bargain and implicate Salimonu in
exchange for leniency was abundantly clear, and his credibility was
further undermined by his admission that he had been a drug dealer
of marijuana and cocaine prior to this conspiracy.
 Petrosino testified to meeting Salimonu on only two or
three occasions in the basement of the house of Perry's mother
where Perry had been cutting Salimonu's hair. Any conversation
between Salimonu and himself was brief, consisting exclusively of
salutations, and he never spoke to Salimonu in person about
anything relating to the conspiracy. In fact, Petrosino testified
that Perry began recruiting him for the conspiracy in April 1992,
more than three months after the last time Petrosino ever saw
Salimonu in person. Petrosino also testified that he was given
money in furtherance of the conspiracy on two occasions by a man
named Foley whom Perry had instructed him to meet. Perry also told
Petrosino how to get his pre-arranged plane ticket and how to
acquire a passport, and it was Perry who provided Petrosino with
money for his passport application. Indeed, on cross examination
by the defense, Petrosino testified that on three separate
occasions he expressed a desire to abandon the conspiracy but that
Perry coerced him into continuing participation through threats and
intimidation.
 Although McKinnon likewise had relatively little face-to-
face interaction with Salimonu, testifying that during the course
of the alleged conspiracy she met him three or four times, she did
testify to more significant personal interaction with Salimonu than
Petrosino had described. McKinnon testified that she met Salimonu
shortly after Perry had begun recruiting her and that she rode
around in a car with Perry and Salimonu for an hour, when Salimonu
told her that she could make a lot of money and repeatedly assured
her that "everything was going to be alright." But it was Perry
who told McKinnon when she was to travel, gave McKinnon her plane
ticket, provided McKinnon with spending money for the trip, and
paid for her hotel rooms. Although McKinnon testified that it was
her understanding that Salimonu was reimbursing Perry for all the
money she saw Perry spend in furtherance of the conspiracy, she got
that impression mostly from what Perry told her. On the witness
stand, McKinnon admitted that she had told the customs
investigators an entirely different story (in her words, "a bunch
of lies") during her initial interrogation. McKinnon also
admitted on the witness stand that she lied in an attempt to
protect Perry (the father of one of her children).
 The majority also emphasizes that the co-conspirators
were consistent with one another even though they "apparently had
no opportunity to communicate after their arrests." However,
McKinnon was arrested on May 29, 1992 and flew to Chicago the next
day (accompanied by U.S. Customs agents) in order to make a
controlled delivery to Perry. Perry came to meet McKinnon at the
airport on May 30, 1992 and from the time Perry met McKinnon (who
had been under arrest for over a day at that point) until he was
arrested in the airport parking lot, Perry and McKinnon were alone
(although under visual surveillance) with a chance to communicate. 
 2. The Tapes of Phone Conversations
 The prosecution introduced into evidence five taped phone
conversations involving Salimonu, one of which involved Petrosino
and four of which involved McKinnon. (A sixth tape involved 
McKinnon and Perry.) Petrosino and McKinnon were under arrest and
cooperating with the U.S. Customs agents at the time of each of the
calls. The call between Petrosino and Salimonu was not
inculpatory. Petrosino attempted to draw Salimonu into a
conversation about the conspiracy but Salimonu simply responded
with confusion. It is undisputed that Petrosino had never called
Salimonu in furtherance of the conspiracy; the U.S. Customs agents
had to provide Petrosino with a phone number for Salimonu because
Petrosino only knew how to contact Perry throughout the course of
the conspiracy.
 Three of four conversations between McKinnon and the man
who was identified as Salimonu were likewise benign. Salimonu is
heard asking McKinnon how her trip was, helping to arrange
McKinnon's flight from Boston to Chicago, and sympathizing with how
much McKinnon misses her children. In their fourth conversation,
Salimonu asks McKinnon: "[d]id they go through your stuff at all?" 
When McKinnon responds in the negative, Salimonu says: "Thank God." 
Of course, the jury could decide that it was in fact Salimonu on
the tape and use this exchange as evidence of Salimonu's knowing
participation in the conspiracy. 
 3. The Evidence from the Search 
 The evidence seized during the warrantless search and
ultimately admitted into evidence includes (1)the Foley Shomuga
phone card and travel records, and (2)multiple cellular phone
records. The former led the government to Angela Nash who
testified that Laddie had asked her to get a cellular phone in her
name for his use. See Wong Sun v. United States, 317 U.S. 471,
485-86 (1963) (noting that the exclusionary rule applies to
evidence gained during a search or as a direct result of a search
and applies to physical as well as verbal evidence). The jury
could have used the Angela Nash testimony to ascribe guilty motives
to Salimonu's deceptive acquisition of a cellular phone using a
non-conspirator's identity. Nash was the only non-conspirator fact
witness to testify to such suspicious activity on the part of
Salimonu, and the government argued her disinterested credibility
to the jury.
 The Foley Shomuga evidence corroborated Petrosino's
testimony. Petrosino testified that "Foley" had given him cash to
buy his plane ticket and, at a later date, cash for his trip. It
is true, as the majority notes, that the prosecution had also
discovered independently of the search and had placed into evidence
a letter from Salimonu to a former landlord in Atlanta establishing
that Salimonu knew a person named Foley. But the phone card seized
from Salimonu's apartment and admitted into evidence put Foley in
Salimonu's apartment in Chicago and also allowed the government to
subpoena Shomuga's travel records from Salimonu's travel agent. 
Until the warrantless search, the police had no surname for Foley. 
Those records, which revealed Foley's travel between Chicago and
Atlanta (a city in which other evidence showed Salimonu had shared
an apartment with Foley), along with the Foley Shomuga phone card
in Salimonu's apartment, provided a key link between Petrosino's
testimony that "Foley" provided him with money for the conspiracy
and the government's theory that Salimonu was the conspiracy's
organizer. Although the majority minimizes this evidence,
claiming that it did not "ha[ve] any significance to the
government's case," it clearly enhanced Petrosino's credibility.
 Angela Nash's testimony also established a foundation for
admission of the cellular phone records which were in her name but
which, according to her testimony, reflected Salimonu's use of the
cellular phone. Although other evidence established that Salimonu
knew Perry and McKinnon, the cellular phone records provided a
documentary basis for arguing that Perry and McKinnon had
truthfully described their involvement with Salimonu in drug
trafficking. Perry's appointment book had multiple references to
Salimonu with an "HC" next to them. Perry himself testified that
these were references to haircut appointments. Fifty-seven phone
calls, however, from Salimonu to Perry, and another fourteen to the
motels where McKinnon was staying with Perry, altered the
evidentiary landscape significantly, and substantially corroborated
Perry's and McKinnon's account of their relationship with Salimonu.
 The government emphasized the significance of the phone
records by preparing poster-size enlargements of summaries of them
so that the jurors could give them extra attention. Then, in its
argument to the jury, the government continuously urged the jury to
rely on the phone records as evidence of the conspiracy and
corroboration of the credibility of the government's witnesses:
 We know that [Salimonu convinced Angela Nash
 to get him a phone in her name] a couple of
 ways. We know that, number 1, she told you.
 We know that, number 2, because the contract
 for that phone was found in his apartment. 
 Remember that? The search in September of
 1993 revealed the service contract in the name
 Angela Nash for that telephone, 3152877.

 And as exhibits in this case, ladies
 and gentlemen, as Exhibits 90, 91, and 92,
 you're going to have the phone charts. They
 are summaries of the Cellular One telephone
 records. Look at them.

 * * *

 You have the [phone] records, you can analyze
 them. But what do they show, ladies and
 gentlemen? They show I can get the numbers
 here some 57 telephone calls from the cell
 phone that [Salimonu] had in Angela Nash's
 name to Christopher Perry in that one six-week
 period.
 But more than that, they corroborate
 Christopher Perry, and they corroborate Kim
 McKinnon, because they show seven calls to the
 Day's Inn where Kim McKinnon was being housed
 and fed, and they show some seven calls to the
 Kitchenette Hotel where she moved . . .
 * * * 
 What we have now is Cellular One
 corroborating Christopher Perry and Cellular
 One corroborating Angela Nash, who in turn
 corroborates Christopher Perry . . .
 * * *
 And then where does this great conspiracy of
 Chris Perry [wrongly implicating Salimonu]
 reach? It reaches into the - - the tentacles
 go into the Cellular One Telephone Company. 
 They reach out to Angela Nash.

 * * *
 Now, try hard as he might, [defense
 counsel] can't cover-up the evidence that does
 show [Salimonu's] guilt. Do you remember the
 57 telephone calls to Chris Perry, either to
 his mother or to the beeper, and then the
 additional ones to the Day's Inn and the
 Kitchenette Hotel? What do you think Laddie's
 calling Chris Perry for? I want to confirm my
 haircut for six weeks from now. But I'll call 
 you again in an hour. But let's just make
 sure we know. 57 times? Holy Moses. Get
 away.

 These multiple exhortations by the prosecutor that the
jury should rely on the phone records reflect the government's
awareness that corroborating the testimony of the co-conspirators
was critical to its case. All of the main witnesses in the case --
Perry, McKinnon, and Petrosino had plea bargained in exchange for
their testimony and had other credibility issues. Although the
jury could believe them without the corroborative evidence obtained
through the search of Salimonu's apartment, that evidence
significantly enhanced the credibility of the co-conspirators. 
Hence the government repeatedly emphasized the importance of the
phone records to the jury in its closing arguments.
 It is an inescapable fact that "[t]he force of a
prosecutor's argument can enhance immeasurably the impact of false
or inadmissible evidence." Brown v. Borg, 951 F.2d 1011, 1017 (9th
Cir. 1991). That enhancement is particularly significant when the
prosecution uses illegally seized corroborative evidence to remove
reasonable doubts from the government's case. I therefore cannot
conclude beyond a reasonable doubt that the evidence gained from
the unconstitutional search of Salimonu's apartment did not affect
the jury's verdict. I would vacate that verdict and remand for a
new trial.